**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| ANDREW NITKEWICZ, AS TRUSTEE OF THE JOAN C. LUPE FAMILY TRUST, on behalf of himself and all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>LINCOLN LIFE & ANNUITY COMPANY OF NEW YORK,<br><br>Defendant. | Case No. 1:20-cv-06805 (JPC) |

## MEMORANDUM OF LAW IN SUPPORT OF
## DEFENDANT LINCOLN LIFE & ANNUITY COMPANY OF NEW YORK'S
## <u>MOTION TO DISMISS PURSUANT TO RULE 12(b)</u>

BOIES SCHILLER FLEXNER LLP

333 Main Street
Armonk, New York 10504
Telephone: 914.749.8200
Facsimile: 914.749.8300

55 Hudson Yards
New York, New York 10001
Telephone: 212.446.2300
Facsimile: 212.446.2350

44 Montgomery Street
41st Floor
San Francisco, CA 94104
Telephone: 415.293.6800
Facsimile: 415.293.6899

*Attorneys for Defendant Lincoln Life &*
*Annuity Company of New York*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ......................................................................................... ii

INTRODUCTION .................................................................................................... 1

BACKGROUND ...................................................................................................... 3

    I.     The Policy and Its Features .......................................................................... 3

         A.     Each month, LLANY deducts funds that extend insurance coverage for that month only. ..................................................................................... 4

         B.     The Policy offers two death benefits distinguished by their different treatment of the Policy account value. ....................................................... 4

         C.     Planned Premiums are optional payments made at the Owner's election. . 7

    II.    The Owner's Choices ............................................................................. 8

    III.   The Alleged Breach ............................................................................... 8

LEGAL STANDARD ............................................................................................... 9

ARGUMENT .......................................................................................................... 9

    I.     Plaintiff Fails to State a Claim for Relief Because Plaintiff's Elective Deposit Was Not "Actually Paid for Any Period" of Coverage under Section 3203(a)(2). ........ 9

         A.     Plaintiff's reading is unsupported in the case law. .................................... 9

         B.     Plaintiff's elective deposit was not actually paid "for any period" of coverage. ................................................................................................... 11

         C.     Plaintiff's elective deposit was not "actually paid" for any period of coverage. ................................................................................................... 13

         D.     LLANY's interpretation is confirmed by NYDFS guidance. ................... 13

         E.     The Policy's provisions and structure illustrate why Plaintiff seeks to re-write the policy. ......................................................................................... 16

    II.    In Any Event, the Policy's Structure and Features Show Plaintiff Already Received the Account Value. ........................................................................ 17

    III.   Alternatively, Plaintiff's Class Allegations Suffer Fundamental Standing Defects. ................................................................................................... 19

         A.     The Complaint does not plead facts to establish class standing for the Premium Refund Class and Universal Life Class. .................................... 20

         B.     Policyholders who chose Option II have no standing to participate in any class and must therefore be excluded from all class definitions. .............. 23

CONCLUSION ...................................................................................................... 24

# TABLE OF AUTHORITIES

**Cases**

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)........................................................................................... 9

*Bankers Trust Co. v Equitable Life Assur. Soc'y of the U.S.*,
    22 A.D. 2d 579 (1st Dep't 1965),
    *rev'd on other grounds*, 19 N.Y.2d 552 (1967) ................................. 10, 14

*Barlow v. Gov't Employees Ins. Co.*,
    2020 WL 5802274 (E.D.N.Y. Sept. 29, 2020) ....................................... 16

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007)........................................................................................... 9

*Buck v. Am. Gen. Life Ins. Co.*,
    2018 WL 5669173 (D.N.J. Oct. 31, 2018) ............................................. 12

*Calvo v. City of New York*,
    2018 WL 1633565 (S.D.N.Y. Apr. 2, 2018) ........................................... 25

*Denney v. Deutsche Bank AG*,
    443 F.3d 253 (2d Cir. 2006) ...................................................................... 24

*Fernandez v. UBS AG*,
    222 F. Supp. 3d 358 (S.D.N.Y. 2016) ..................................................... 24

*Flynn v. DIRECTV, LLC*,
    2016 WL 4467885 (D. Conn. Aug. 23, 2016) ....................................... 25

*GEICO Marine Ins. Co. v. Great N. Ins. Co.*,
    2017 WL 4286394 (S.D.N.Y. Sept. 11, 2017),
    *report and recommendation adopted*, 2017 WL 4286312 (S.D.N.Y. Sept. 26, 2017)............. 12

*HSBC Bank USA v. Nat'l Equity Corp.*,
    279 A.D.2d 251 (1st Dep't 2001) ............................................................ 17

*In re Gen. Motors LLC Ignition Switch Litig.*,
    2016 WL 3920353 (S.D.N.Y. July 15, 2016) ......................................... 24

*Merryman v. J.P. Morgan Chase Bank, N.A.*,
    2016 WL 5477776 (S.D.N.Y. Sept. 29, 2016)......................................... 22

*Milich v. State Farm Fire & Cas. Co.*,
    No. 10 CV 5991 DRH ARL, 2012 WL 4490531 (E.D.N.Y. Sept. 28, 2012), *aff'd*, 513 F.
    App'x 97 (2d Cir. 2013) .............................................................................. 16

*Ret. Bd. of the Policemen's Annuity & Ben. Fund of the City of Chicago v. Bank of New York
    Mellon*,
    775 F.3d 154 (2d Cir. 2014) ......................................................... 22, 23

*Reynolds v. Lifewatch, Inc.*,
   136 F. Supp. 3d 503 (S.D.N.Y. 2015) ................................................................. 25

*Sanders v. Apple Inc.*,
   672 F. Supp. 2d 978 (N.D. Cal. 2009) ................................................................. 25

*Schering Corp. v. Home Insurance Co.*,
   712 F.2d 4, 10 n.2 (2d Cir. 1983) ....................................................................... 18

*Sonterra Capital Master Fund Ltd. v. Credit Suisse Grp. AG*,
   277 F. Supp. 3d 521 (S.D.N.Y. 2017) ........................................................... 22, 23

*Stanley v. Direct Energy Servs., LLC*,
   2020 WL 3127894 (S.D.N.Y. June 12, 2020) ..................................................... 24

*State Farm Mut. Auto. Ins. Co. v. Fitzgerald*,
   25 N.Y.3d 799 (2015) .......................................................................................... 18

*Tomassini v. FCA US LLC*,
   326 F.R.D. 375 (N.D.N.Y. 2018) ........................................................................ 25

*Westmoreland Coal Co. v. Entech, Inc.*,
   100 N.Y.2d 352 (2003) ........................................................................................ 12

**Statutes**

26 U.S.C. § 7702(a) ................................................................................................... 5

44 C.J.S. Insurance § 26 ............................................................................................ 7

N.Y. Ins. Law § 3201(b)(1) ..................................................................................... 14

N.Y. Ins. Law § 3203(a)(2) ............................................................................... *passim*

N.Y. Ins. Law § 3420(j)(1) ...................................................................................... 16

N.Y. Ins. Law § 24:4 ................................................................................................. 7

**Rules**

11 N.Y.C.C.R. § 53-2.7 .............................................................................................. 7

Fed. R. Civ. P. 12(f) ................................................................................................. 25

Fed. R. Civ. P. 23(c)(1)(A) ...................................................................................... 25

**Other Authorities**

5 Couch on Ins. § 69:1 ............................................................................................. 10

Product Outlines Guidance for Insurers When Submitting Life and Annuity Product Filings,
   https://www.dfs.ny.gov/insurance/lifeintr.htm ................................................... 14

## INTRODUCTION

This is an action for breach of contract on a universal life insurance policy.  Plaintiff's theory of breach rests on a New York statute that implies "in substance" the following term into certain insurance contracts:  The "insurer shall add to the policy proceeds a refund of any premium actually paid for any period beyond the end of the policy month in which [the insured's] death occurred."  Plaintiff fixates on the word "premium," ignoring that the statute requires the premium to have been "actually paid for any period beyond the policy month."  Plaintiff's interpretation of the statute is unprecedented and inconsistent with the New York insurance regulator's published guidance.  Plaintiff's contract interpretation disregards how universal life insurance works and would undermine the Policy's provisions and structure.  In any event, Plaintiff already received the benefit of the insurance bargain.  The Complaint should be dismissed in full, and final judgment entered for Defendant.  Alternatively, at least two of the Complaint's three putative classes should be dismissed for lack of class standing and insufficient fact allegations, and all of Plaintiff's classes should be narrowed because the Complaint establishes that large swathes of putative class members cannot have suffered any injury.

*          *          *

Plaintiff is trustee for a legal entity that owns a universal life insurance policy (the "Owner" and the "Policy") issued by defendant Lincoln Life & Annuity Company of New York ("LLANY").  LLANY's universal life insurance combines insurance coverage with an interest-bearing account that has a cash value (the "Policy account").  The Policy account's value determines the amount of insurance LLANY provides and how the death benefit is paid out.  The Policy's cash value also earns interest, is accessible to the Owner via partial or total surrender of the Policy, can be used as collateral on a loan, and may provide tax benefits.  As for the insurance component, the Policy provides that LLANY shall make a once-monthly deduction from the Policy

1

account.  The Policy expressly provides that the monthly deduction pays for insurance coverage for the month in which it was made.  Life insurance benefits do not lapse so long as there is sufficient value in the Policy account to pay the deduction.

The Policy also includes a framework for planning periodic deposits, called "Planned Premiums," into the Policy account.  The Policy expressly states that Planned Premiums are optional and that to use the Planned Premium option is to make a non-binding statement of intent about when and how deposits will be made; it is not an agreement or requirement to actually make a payment.  Taking advantage of the Planned Premium feature, Plaintiff chose to make annual Planned Premium additions to the Policy's account value.

Upon the insured's death, LLANY paid the benefit for which the Owner expressly contracted.  Now Plaintiff wants to re-write the Policy:  New York Insurance Law § 3203(a)(2) provides that "the insurer shall add to the policy proceeds a refund of any premium actually paid for any period beyond the end of the policy month in which such death occurred."  Plaintiff sues for breach of contract, seeking a return of certain funds he chose to deposit as a Planned Premium—even though those funds were never "actually paid for any period" of insurance.

Plaintiff's theory is unprecedented and unsupportable.  Plaintiff looks no further than the word "premium," ignoring the rest of the statutory text ("actually paid for a period") and disregarding  how the Policy works.[1]  The statute on which Plaintiff relies has existed for almost 100 years, but we are aware of no court that has ever taken Plaintiff's view.  The New York insurance regulator, the New York Department of Financial Services ("NYDFS"), publishes guidance that is inconsistent with Plaintiff's reading of the statute.  And Plaintiff's theory would

---

[1] The monthly charge is distinguishable from the term "premium" under the terms of the Policy and in other contexts—but, as explained herein, it is the only amount "actually paid for any period" of coverage, which is the issue under the statute Plaintiff asserts.

fundamentally undermine the Policy and its features—and give Plaintiff more than the benefit of the insurance bargain.

Should the Court deny LLANY's motion to dismiss the entire Complaint, LLANY respectfully requests that the Court dismiss two of the three classes that Plaintiff alleges because Plaintiff does not allege any facts explaining how his theory fits those classes and because Plaintiff lacks class standing. Finally, absent outright dismissal, all three classes should be narrowed because the complaint demonstrates that, under Plaintiff's theory, many putative members cannot have suffered any injury in fact.

## **BACKGROUND**

### I.  **The Policy and Its Features**

The Policy at issue is "Flexible Premium Adjustable Life Insurance," which is LLANY's "generic name for universal life insurance." Exhibit A to Declaration of Betsy Johnson (Policy) at 2. By definition, Flexible Premium insurance leaves premium payment—whether, when, how, and how much—largely to the Owner's discretion. *Id.* ("'Flexible premium' means that You may pay premiums by any method agreeable with Us, at any time prior to the Insured's Attained Age 121 and in any amount subject to certain limitations."). As a universal life policy, the Policy includes an account that has a cash value, referred to variously as the Policy's "account," the "Policy Value," or the Policy's "cash value." *Id.* at 2–5, 7–15. The balance of the Policy account earns interest monthly. *Id.* at 2, 4, 11. Among other things, the Owner may access the Policy's cash value by "surrendering" the Policy (in part or in whole), or the Owner could use the Policy account value as collateral for a loan. *Id.* at 12–14.

A.     Each month, LLANY deducts funds that extend insurance coverage for that
       month only.

A "monthly deduction" from the Policy account extends the Policy's term by one month.

*Id.* at 9, 11–12.  The monthly deduction has two components, the "cost of insurance" ("COI")

charge and permissible "administrative charges."  *Id*. at 11.  The COI charge is calculated as a

function of the "net amount at risk"—*i.e.*, the amount the insurer would pay upon the insured's

death.  *Id*. at 11–12.  That is, the COI charges generally correspond to the level of insurance

coverage; they are higher when the Policy would have a higher total insurance payout upon death

("Proceeds") and lower when the Policy would have a lower insurance payout.  *See id.*

The Policy specifies that LLANY applies the deduction on the first day of each Policy

month.  *Id.* at 9.  So long as the Policy account balance covers the coming month's charges,

LLANY will make the deduction automatically, thereby extending insurance coverage for the

coming month.  *Id.*; *see also id.* at 2 ("If the Policy Value, less surrender charge, less Debt (Cash

Surrender Value) becomes so small that We cannot take an entire monthly deduction, Your policy

may terminate; see, however, the Grace Period Provision.").  Otherwise, the Policy will enter a

grace period and ultimately lapse if the Owner does not pay "the minimum amount needed to

continue th[e] policy"—namely, the monthly deduction.  *Id.* at 9; *see also id.* at 8–9 ("The policy

will terminate only if" certain conditions are met, one of which is that the Policy account value is

"less than the monthly deduction due" and the ensuing "grace period ends.").

B.     The Policy offers two death benefits distinguished by their different treatment of
       the Policy account value.

The Policy offers a choice of two death benefit options, which the Owner may change

anytime "after the first policy year and prior to the Insured's Attained Age 121."  *Id.* at 10.  Under

"Option I," the minimum death benefit is a "Specified Amount," similar to a face value or "Face

Amount"  (*see* Policy, Application for Life insurance at 2), that the Owner has selected (less any

debt from a Policy loan).  Policy at 10.  Option I therefore offers lower COI charges by using the Policy account value to reduce the net amount at risk.  *Id.* at 10–11.

Critically, this means that, under Option I, the insured pays for coverage at the level of the Policy's face value <u>less</u> the Policy account value.  Therefore, the proceeds that LLANY pays out upon the death of the insured are that amount of insurance for which the owner paid—*i.e.*, the amount LLANY had at risk—<u>plus</u> the Policy account value.  *Id.* at 11 ("The cost of insurance is determined on a monthly basis as the cost of insurance rate for the month multiplied by the net amount at risk for the month."); Coverage Protection Guarantee Rider at 2 (same).  Moreover, under Option I, if the Policy account value is higher than the Specified Amount, then the death benefit is not calculated using the Specified Amount but instead will be the Policy account value, increased according to a schedule the Internal Revenue Code uses to define what qualifies as a "life insurance contract" for certain tax purposes.  *Id.* at 9 (providing that "[t]he death benefit of th[e] policy is the larger of" the death benefit option selected by the policyholder or the Policy account value augmented by a coefficient provided by the Internal Revenue Code's life insurance requirements); *compare id.* at 4B, *with* 26 U.S.C. § 7702(a).

Alternatively, "Option II" provides a minimum death benefit of the Specified Amount plus the Policy account value (less any loan debt).  Policy at 10.  Option II leads to higher COI charges because, in contrast to Option I, the Policy account value does not offset any of the Specified Amount for purposes of calculating the net amount at risk.  *Id.*  In other words, under Option II, the insured pays for coverage at the level of the entire face value.  This also means that, under Option II, whatever value remains from the last Planned Premium deposit becomes part of the death benefit and thus is returned explicitly.  *Id.* ("The death benefit is the Specified Amount on the date of death plus the Policy Value at the beginning of the policy month of death.").

To illustrate:

| | Option I | Option II |
|---|---|---|
| Death Benefit | Specified Amount | Specified Amount + Policy Value |
| Net Amount at Risk[2] | Specified Amount – Policy Value | (Specified Amount + Policy Value)<br>− Policy Value<br>= **Specified Amount** |
| Relationship of Policy Value to Net Amount at Risk | Increase in the Policy Value results in decrease in the net amount at risk (and decrease in COI charges based thereon). | The net amount at risk (and COI charges based thereon) stays equal to the Specified Amount because any change in Policy Value is net-neutral to the insurer's share of the proceeds. |

The ability to choose between the death benefit options is key to the Policy's construction and features.  *See id.* at 2 (the Policy is "Adjustable Life Insurance," which "means that You, with Our agreement, can change the death benefit to meet Your changing needs.").  Policyholders who select Option I benefit from lower COI charges and higher Policy account value that can be used later to (i) pay future monthly deductions or (ii) added to the death benefit by converting the Policy to Option II.  On the other hand, policyholders who select Option II benefit from a larger death benefit and may obtain additional tax benefits.  *See id.* at 7.  Under either option, the Policy account value is closely related to the immediate benefits that the owner receives from a Planned Premium deposit—before any deduction—including through its relationship to the death benefit and COI charges.  On the other hand, there is no 1:1 correspondence between money paid into the policy (including Planned Premiums) and the continuation of coverage, much less any discrete "period" of coverage.  That is because premiums are credited directly to the cash value of the Policy, where they earn interest and remain accessible to the owner.  The continuation or lapse of coverage is independently determined by reference to the monthly deduction and grace period provisions.

These features stand in contrast to standard term life insurance, which provides coverage

---

[2] Assumes no outstanding debt from a loan taken against the Policy.  *See* Policy at 9–11.

only for a specified term and has no cash-value account.  31 N.Y. Prac., New York Insurance Law § 24:4 ("'Term life' insurance is defined as life insurance for a specified term only, the premium being calculated on a basis which provides coverage only for a death which occurs during the term"); *see also* 11 N.Y.C.C.R. § 53-2.7 (contrasting term life insurance with cash-value life insurance, including universal life insurance).  Term life insurance has mandatory periodic premiums that keep the policy in force.  44 C.J.S. Insurance § 26 (defining term life insurance as "insurance for the term or period for which a premium has been paid, with the right to continue it from term to term on payment of the proper premium").  In the term life situation, each payment has a 1:1 correspondence with a period of coverage.  31 N.Y. Prac., New York Insurance Law § 24:4.  As a consequence, term life insurance premiums paid for future periods do not provide any direct benefit to the customer.  Conversely, such payments do not obligate the insurer to  perform any contractual duties until future periods.

      C.    <u>Planned Premiums are optional payments made at the Owner's election.</u>

Consistent with the goal of premium flexibility for the insured, the Policy also includes a "Planned Premium" feature.  Policy at 8.  "Planned Premiums" are payments into the Policy account at intervals of the owner's choice.  *Id.* ("The Planned Premium and Premium Frequency . . . are selected by You.").  To use the feature, an owner simply makes a statement of when and how he intends to make deposits into the Policy account.  *Id.* ("The Planned Premium is the amount of premium You intend to pay.  The Premium Frequency is how often You intend to pay the Planned Premium.").  The Planned Premium provisions are a financial-planning tool, and the Policy expressly stresses that they are used at the Owner's "option."  *Id.* ("Payment of the Planned Premium is Your option."); *see also id.* ("Failure to pay a Planned Premium will not, in itself, cause this policy to terminate.").

For example, the Planned Premium provisions may be used for estate planning purposes. In this respect, the death benefit and Planned Premium provisions have been carefully constructed with the intent to meet certain Internal Revenue Code provisions, including a "Federal Income Tax exclusion." *Id.* at 7 ("This policy is intended to qualify as life insurance under the Internal Revenue Code.  The death benefit provided by this policy is intended to qualify for the Federal Income Tax exclusion.").

## II.     The Owner's Choices

Here, the Owner chose to utilize the Planned Premium provisions and elected to make $53,877.72 annual deposits.  Dkt. 1, Compl. ¶ 18; Policy, Application for Life Insurance at 1.  The Owner selected the Option I death benefit and did not opt to change to Option II prior to the insured's death.  Policy at 3.  The Owner thereby took advantage of the Planned Premium and Option I benefits described above as soon as the Planned Premium was deposited.

## III.    The Alleged Breach

New York Insurance Law § 3203(a)(2) requires that the Policy incorporate the "substance" of the following term:  "if the death of the insured occurs during a period for which the premium has been paid, the insurer shall add to the policy proceeds a refund of any <u>premium actually paid for any period beyond the end of the policy month</u> in which such death occurred . . ." (emphasis added).

When the insured died, LLANY paid out the death benefit that Plaintiff had chosen (Option I).  Compl. ¶ 18.  Now Plaintiff alleges that LLANY violated Section 3203(a)(2)'s terms by not issuing a partial "refund" of the most-recent Planned Premium as part of the death benefit proceeds. *Id.* ¶ 19.  But the plain terms of Section 3203(a)(2) show that it cannot apply to Planned Premiums, and that it must be read with an understanding of universal life insurance:  Only the monthly deduction is "actually paid" (all other funds remain in the policy account, where they earn interest,

lower the COI charges by reducing the net amount at risk, may be withdrawn via partial or total surrender, collateralized for a loan, and provide other benefits to the Owner).   And only the monthly deduction pays for insurance coverage "for any period."  Planned Premiums, by contrast, increase the cash value of the Policy account; they do not pay for specific periods of coverage.

## LEGAL STANDARD

To survive a motion to dismiss, a complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  The Court is "'not bound to accept as true a legal conclusion couched as a factual allegation,'" or to credit "mere conclusory statements."  *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555).  A claim is facially plausible when the factual content pleaded allows a court "to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id*. at 678.

## ARGUMENT

**I.     Plaintiff Fails to State a Claim for Relief Because Plaintiff's Elective Deposit Was Not "Actually Paid for Any Period" of Coverage under Section 3203(a)(2).**

Plaintiff is not entitled to a refund from the Policy account value because the Planned Premium deposit was not "actually paid for any period beyond the end of the policy month in which such death occurred."

A.     Plaintiff's reading is unsupported in the case law.

Section 3203(a)(2) and its predecessors have existed for nearly 100 years.  Laws of the State of New York, 1923, c. 28, sec. 101.  But we can find no case where the refund clause in Section 3203(a)(2) or its predecessors have been interpreted consistent with Plaintiff's theory.[3]

---

[3] After LLANY explained that Plaintiff's theory is unprecedented, Plaintiff cited allegations about the conduct of a different insurer with a different (and undisclosed) policy as "precedent."  Dkt. 19, Pltf.'s Resp. Letter at 3.  Allegations about private-party conduct are not legal precedent.

That makes sense because Section 3203(a)(2) has a straightforward purpose: to prevent insurers from taking and keeping money for which the insured gets no benefit. The purpose is easy to see when applied to term life insurance contracts: The entirety of each periodic life insurance payment extends insurance coverage for a specific period (and only that period). If there is no life to insure during that period, the insured has derived no benefit and the insurer has not performed its role. *See* 5 Couch on Ins. § 69:1. Preventing this situation—where the insurer is paid for a period where it has no obligation, and where the insured cannot benefit from payments for future periods—is a common aim of insurance statutes. *Id.* § 79:2.

On the other hand, in universal life insurance, the customer immediately benefits from a Planned Premium deposit and the insurer upholds its end of the bargain by paying interest, adjusting the COI charge, providing the opportunity for a loan or (partial) surrender, and so forth. *See Bankers Trust Co. v Equitable Life Assur. Soc'y of the U.S.*, 22 A.D. 2d 579, 582 (1st Dep't 1965) ("[T]he cash surrender value of a policy is a 'fund' held by the insurer for the benefit of the insured"). Thus, the insurer provides value for funds that become part of the Policy account and the owner receives the benefit of the insurance bargain. Moreover, the customer remains in control of whether, when, and how to make Planned Premium deposits. For these reasons, the concerns underlying Section 3203(a)(2) do not arise when voluntarily paid funds increase the Policy account value.

In short, Section 3203(a)(2) is well understood and has never needed a judicial gloss. The statute (and the regulatory guidance, *see* Arg.I.D, below) make clear that Section 3203(a)(2) applies to a specific type of payment—a "premium actually paid" (or "applied to") a specific "period" of coverage. Planned Premiums are neither. The concerns addressed by Section

3203(a)(2) are largely uncontroversial and a common subject of insurance law and regulation. Planned Premiums do not raise those concerns.

      B.    <u>Plaintiff's elective deposit was not actually paid "for any period" of coverage.</u>

The Complaint alleges that Planned Premiums are "for" the period of one year because Plaintiff chose to make those optional deposits annually. Compl. ¶ 18. The Policy provides that the Planned Premium may (i) be insufficient to cover the scheduled interval's monthly deductions, Policy at 3 ("The Planned Premium may need to be increased to keep this policy and the coverage in force."), or (ii) be greater than the cost of continuing coverage during the scheduled interval and thus cause the Policy account value to increase. Among other things, this increased account value lowers the net amount at risk, and thus lowers the monthly deductions for insurance coverage, and can be accessed by the policy owner (via surrender, partial surrender, or loan). Thus, Planned Premiums affect the amount and pricing of the insurance coverage each month. Planned Premiums do not, however, determine the duration of coverage. *Id.* at 4.

Plaintiff's view creates practical and statutory interpretation problems—none of which arise when the words "for a period of coverage" are given effect. *Cf. GEICO Marine Ins. Co. v. Great N. Ins. Co.*, 2017 WL 4286394, at *5 (S.D.N.Y. Sept. 11, 2017), *report and recommendation adopted*, 2017 WL 4286312 (S.D.N.Y. Sept. 26, 2017) ("[T]he policy must 'be read as a whole, and every part will be interpreted with reference to the whole; and if possible it will be so interpreted as to give effect to its general purpose [because the] meaning of a writing may be distorted where undue force is given to single words or phrases.'" (quoting *Westmoreland Coal Co. v. Entech, Inc.*, 100 N.Y.2d 352, 358 (2003))). Consider, for instance, an owner who deposits a Planned Premium and then, a couple months later, makes an unscheduled payment into the Policy account. In order to identify the refundable amount under Plaintiff's theory, Plaintiff needs to explain whether the Planned Premium or the unplanned payment into the account is a refundable

11

premium.  Plaintiff also needs to adopt unjustifiable rules to determine which funds were used to pay "for" any particular "period."   Under last-in-first-out, an unplanned deposit—or any intervening interest payment—reduces the amount of "Planned Premium" that is "actually paid" because the unplanned deposit and interest payments, not the "Planned Premium" are deducted first.   That result is inconsistent with Plaintiff's view that Planned Premiums are "for" any identifiable "period."   Under first-in-first-out, sufficiently high account values could turn the Planned Premium provisions into a money tree:  Planned Premiums would earn interest, reduce the COI charge—and then get refunded because Plaintiff would deem other pre-existing funds to have been deducted first.  By so altering the characterization and use of funds, either approach can create unforeseen tax or regulatory risks and other knock-on effects.  *See Buck v. Am. Gen. Life Ins. Co.*, 2018 WL 5669173, at *1 (D.N.J. Oct. 31, 2018) (noting that different treatments of universal life policies may raise tax consequences "too complicated to explain").   On the other hand, the workings of the statute and the Policy remain straightforward if one recognizes that the Policy account is not "paid for any period," but has value in and of itself, and serves purposes that are not tied to any period.

Plaintiff's interpretation creates other problems that never arise under the correct view. The statute provides two inverse remedies: (i) the first permits insurers to "deduct from the policy proceeds the portion of any <u>unpaid premium applicable to the period</u> ending with the last day of the policy month in which such death occurred . . . provided such premium was not waived under any policy provision for waiver of premiums benefit," and (ii) the second requires insurers to "add to the policy proceeds a refund of any <u>premium actually paid for any period</u> beyond the end of the policy month in which such death occurred."  N.Y. Ins. Law § 3203(a)(2) (emphasis added).  If Planned Premiums could be premiums "paid for a period" or "applicable to a period," then

allowing an insurer to "deduct" an "unpaid" Planned Premium converts an optional statement of intent into a monetary obligation the insurer can demand.  The result would be the insurer deducting amounts in excess of the last month's coverage—*i.e.*, it would enable the very kind of excess payments the statute aims to prevent.  *See* Arg.I.A, above.  Further, the statute's references to a grace period and a waiver-of-premiums benefit make no sense if they apply to Planned Premiums because  there is nothing to waive or grace to offer when an owner chooses not to make an optional payment.

Alternatively, the correct construction causes none of these problems.

C.      Plaintiff's elective deposit was not "actually paid" for any period of coverage.

In addition, the statute's emphatic use of "actually" is significant.  The term would be superfluous unless it distinguishes statements of intent and funds to which the Owner retains some rights from premium payments that become revenue to the insurer.  Planned Premiums are not "actually paid" to the carrier for insurance coverage for a specific period because they entail only a statement of intent and increase the account value; the cost of insurance is not  "actually paid" until the monthly deduction from the account value.  Until then, the Planned Premiums keep working for the insured's benefit by earning interest, and they are accessible to the owner.  *See Bankers Trust*, 22 A.D. 2d at 582 ("[T]he cash surrender value of a policy is a 'fund' held by the insurer for the benefit of the insured.").

D.      LLANY's interpretation is confirmed by NYDFS guidance.

Published guidance from New York's insurance regulator confirms that Section 3203(a)(2) addresses only the deductions required to keep the Policy in force and not any additional amounts deposited at the Owner's discretion.  Insurance policies are subject to the review and approval of NYDFS before issuance.  N.Y. Ins. Law § 3201(b)(1).  NYDFS regularly publishes "Product Outlines" that provide "general guidance" for how NYDFS applies state insurance law and

13

regulation in its review and approval process.[4]  Those Product Outlines comport with LLANY's interpretation.

Then NYDFS Product Outline for individual universal life insurance policies explains that Section 3203(a)(2) concerns "the <u>amount needed to continue the policy</u>" that "has been applied" to future months, and requires refunding "such amount <u>applied for any period</u> beyond the policy month in which the death occurred."  Exhibit B to LLANY's Request for Judicial Notice at 15. The Policy uses the same phrase as the Product Outline—"the amount needed to continue the policy" to describe the "deduction."  Policy at 9 ("If on a Monthly Anniversary Day the Cash Surrender Value is less than the monthly <u>deduction</u> due, Your policy will enter the grace period. A grace period of sixty-one (61) days from the date that the policy enters the grace period will be allowed <u>for the payment of the minimum amount needed to continue this policy</u>." (emphasis added)).  Onn the previous page, the Policy explains that the Planned Premium is not the amount needed to continue the policy.  *Id.* at 8.

By contrast, the Product Outline for term life insurance—which has no cash-value account—uses the word "premium," just like the statute.  Ex. C to RJN at 15.  Specifying "premiums actually paid for any period" as "the amount needed to continue the policy [that] has been applied"  is unnecessary for term life insurance because, by definition, term life insurance has only periodic premiums that correspond directly to periods of continued coverage (there is no cash-value account into which additional premiums could be paid).  *See* Bkgd.I.B, above.  That is, for term life insurance, all amounts paid to the insurer are for a defined period of coverage, and are thus premiums "for a[] period" within the ambit of the statute.  In applying Section 3203(a)(2)

---

[4] "Product Outlines Guidance for Insurers When Submitting Life and Annuity Product Filings," *available at* https://www.dfs.ny.gov/insurance/lifeintr.htm.

to universal life policies, however, the guidance eschews the general ("premium for any period") for the specific ("amount needed to continue the policy").

NYDFS guidance is consistent in this approach.  The Product Outline for variable life policies, which provide an investment account similar to universal life's interest-bearing cash-value account, also uses the "amount needed to continue the policy" terminology rather than the generic "for any period."  Ex. D to RJN at 15.  Likewise, the Product Outline for whole life policies, which resemble term insurance (and provide no account feature), uses the generic "for a period." Ex. E to RJN at 12.

| NYDFS Product Outlines | |
|---|---|
| Universal Life  and Variable Life Product Outlines (Policies <u>with</u> cash-value accounts) | Term Life and Whole Life Product Outlines (Policies <u>without</u> cash-value accounts) |
| "[I]f death occurs during a period <u>for which the amount needed to continue the policy has been applied,</u> the insurer must add to the policy proceeds a <u>refund of such amount applied for any period</u> beyond the policy month in which the death occurred." (emphases added.) | "If death occurs during <u>a period for which a premium has been paid</u>, the insurer must add to the policy proceeds a <u>refund of any premium actually paid for any period</u> beyond the policy month in which the death occurred." (emphases added.) |

The consistency across the regulatory guidance and the rest of the law confirms that funds in the Policy value are not premiums actually paid for any period.

Plaintiff's pre-motion letter quarrels that citation to an agency's interpretation is "misplaced" when the statute's language is unambiguous.  Pltf.'s Resp. Letter at 2.  Plaintiff misapprehends the point:  The regulatory guidance is a legal interpretation that, much like a non-controlling opinion, may be used to buttress legal reasoning and confirm the statute's plain meaning.  No rule of law makes courts blind to NYDFS materials in situations that do not involve ambiguity.  *See, e.g.*, *Milich v. State Farm Fire & Cas. Co.*, 2012 WL 4490531, at *3–4 (E.D.N.Y. Sept. 28, 2012), *aff'd*, 513 F. App'x 97 (2d Cir. 2013) (relying on NYDFS guidance to explain the purpose of N.Y. Ins. Law § 3420(j)(1) where the "[t]he statute makes clear" its application on its

15

face); *Barlow v. Gov't Employees Ins. Co.*, 2020 WL 5802274, at *5–6 (E.D.N.Y. Sept. 29, 2020) (noting the operative regulation "specifically explains" the term "actual cash value," but nevertheless relying on an NYDFS opinion to "further clarify" the issue).

E.    <u>The Policy's provisions and structure illustrate why Plaintiff seeks to re-write the policy.</u>

Principles of contract interpretation and the Policy's structure also show that Planned Premiums do not fall within the statute.  Like statutes, contracts should be interpreted as a whole and in light of their full context.  *HSBC Bank USA v. Nat'l Equity Corp.*, 279 A.D.2d 251, 253 (1st Dep't 2001) ("It is an elementary rule of contract construction that clauses of a contract should be read together contextually in order to give them meaning.").  Plaintiff violates this rule by focusing solely on the word "premium" in the term "Planned Premium" and takes it out of context.  By so doing, Plaintiff would upend the Policy's pricing mechanics and take benefits for which the Owner has not paid.

As explained above, Plaintiff took Option I's lower pricing in exchange for a particular death benefit and additional time for funds to accrue interest.  Now Plaintiff wants to receive part of the heightened death benefit provided by Option II—without paying for it.  Plaintiff's theory alters the most basic workings of the Policy—he double dips by using Planned Premiums to lower his COI and earn interest, then demanding that the funds be returned for free.  He mistakes an optional deposit for funds "actually paid for" a "period of coverage."   And he undermines how the death benefit is calculated, which fundamentally alters the benefit of the bargain and may disrupt the Policy's tax treatment or create adverse tax consequences.  *See* Bkgd.I.B, above.

Plaintiff has attempted to justify these results by pointing out that contracts, including insurance contracts, are construed against the drafter in some circumstances.  Plaintiff's invocation of this doctrine, called *contra proferentem*, is inapposite.  *See* Pltf.'s Resp. Letter at 3 (citing the

doctrine of *contra proferentem*).  The legislature wrote the provision at issue, not one of the contract's counterparties.  Thus, the concerns behind the rule—that one party might take advantage of another regarding the extent of insurance coverage—does not apply, and the doctrine has no place: "a policy provision mandated by statute must be interpreted in a neutral manner consistently with the intent of the legislative and administrative sources of the legislation."  *State Farm Mut. Auto. Ins. Co. v. Fitzgerald*, 25 N.Y.3d 799, 804 (2015).[5]

## II.    In Any Event, the Policy's Structure and Features Show Plaintiff Already Received the Account Value.

Separate and apart from the above arguments, Plaintiff's claim should be dismissed because Plaintiff already received the Policy account value, including any value attributable to his last Planned Premium deposit.  Thus, there is no premium to be refunded.

As detailed above, the Policy provides insurance coverage at the level of the net amount at risk.  *See* Bkgd.I.B, above.  The net amount at risk is what LLANY is responsible for paying out of its own funds at death.  At death, the Policy account is cashed out, and the proceeds paid to the owner are equal to the Policy account value plus the amount of insurance—*i.e.*, the net amount at risk.  Thus, under Option I, the insured pays a monthly COI charge that corresponds to the difference between the Policy account value and the Specified Amount in (or face value of) the Policy.  Option II carries a higher COI charge because its coverage is calculated to include the entire Specified Amount in the net amount at risk.  Either way, at death the Policy

---

[5] To the extent Plaintiff contends that the Policy's words are at issue, *contra proferentem* would not be available until all other routes to determining the parties' intent are exhausted, including extrinsic evidence.  *Schering Corp. v. Home Insurance Co.*, 712 F.2d 4, 10 n. 2 (2d Cir. 1983) ("*contra proferentem* is used only as a matter of last resort, after all aids to construction have been employed but have failed to resolve the ambiguities in the written instrument. This is clearly the law in New York.  To conclude otherwise would require every ambiguously drafted policy to be automatically construed against the insurer." (citations omitted)); *id.* at 9 ("[W]here contract language is susceptible of at least two fairly reasonable meanings, the parties have a right to present extrinsic evidence of their intent at the time of contracting.").

account is in effect cashed out and LLANY adds the net amount at risk to the proceeds:

|  | **Option I** | **Option II** |
|---|---|---|
| Death Benefit | Specified Amount | Specified Amount + Policy Value |
| Net Amount at Risk (*see* Bkgd.I.B, above) | Specified Amount – Policy Value | Specified Amount |
| Proceeds | Net Amount at Risk <br> + Policy Value <br> = Specified Amount | Net Amount at Risk <br> + Policy Value <br> = Specified Amount + Policy Value |

The Policy reflects this economic reality.  The Option II "death benefit is the Specified Amount on the date of death <u>plus the Policy Value</u> at the beginning of the policy month of death." Policy at 10 (emphasis added).  This is straightforward because, from both the owner and LLANY's  perspective, the Option II death benefit is the same because the consumer has paid for coverage, and LLANY has insured, the entire Specified Amount.

Option I expresses the same substance, but puts it from the insured's perspective for clarity. Under Option I, the "death benefit is the Specified Amount on the date of death" because that is the insured's bottom-line.  At least three other Policy provisions confirm that the customer receives the amount insured plus the account value.  *First*,  the COI calculation is clear about what the insured pays for—insurance of the net amount at risk.  *Id.* at 11.  *Second*, under Option I, if the account value exceeds the Specified Amount at the time of death, then the death benefit is the Policy value (increased according to an IRC schedule, *see* Bkgd.I.B, above), which further illustrates that the owner receives the benefit of their account value, whether it is higher or lower than the Specified Amount.  *Third*, the Policy provides that any premium paid into the account in the month of the insured's death must be paid out in addition to the death benefit.  Policy at 9. This makes sense because the insured has not reaped the benefits of the payment- namely the reduced COI charge (for Option I), interest, or other benefits after the last monthly deduction and

interest payment.  In the end, the policyholder always receives (i) the level of insurance provided in proportion to the monthly deductions—which level is embodied in the net amount at risk—and (ii) the Policy account value.

## III.   Alternatively, Plaintiff's Class Allegations Suffer Fundamental Standing Defects.

"Sometimes the issues are plain enough from the pleadings to determine whether the interests of absent parties are fairly encompassed within the named plaintiff's claim."  *General Telephone Co. of Southwest v. Falcon,* 457 U.S. 147, 160 (1982).  The Complaint presents such a case.  Its allegations may adequately explain how and why Plaintiff believes the Complaint's allegations could give rise to a claim on behalf of "Planned Premium Class" composed of:

> All owners of universal life (including variable universal life) insurance policies delivered or issued for delivery in the state of New York by The Lincoln Life & Annuity Company of New York and its predecessors in interest that were in force on or after August 24, 2014 and for which the insured died, policy proceeds were paid, and planned annual, semi-annual, or quarterly premiums were paid for any period beyond the end of the policy month of the insured's death.

Compl. ¶ 22.  But the Complaint's allegations cannot support Plaintiff's other two putative classes which, together, include every insurance policy "delivered or issued for delivery in the state of New York . . . on or after August 24, 2014 and for which the insured died and policy proceeds were paid," regardless of policy type.  *Id.* ¶ 20 (defining the "Premium Refund Class").  Nor can they support Plaintiff's putative class of "all owners of universal life (including variable universal life) insurance policies delivered or issued for delivery in the state of New York . . . on or after August 24, 2014 and for which the insured died and policy proceeds were paid."  *Id.* ¶ 21 (defining the "Universal Life Class").  Moreover, all three classes are overbroad as a matter of law because the Complaint establishes that numerous members of the putative classes cannot have suffered any injury in fact.

*First*, the latter two putative classes should be dismissed on the pleadings because Plaintiff cannot establish "class standing"—a constitutional and jurisdictional prerequisite to asserting class claims.  Plaintiff does not allege facts showing that these two of the three classes suffered harm sufficiently similar to Plaintiff's own.  The Complaint relies on specific terms and features of Plaintiff's Policy, but Plaintiff seeks to bring in every policy type LLANY offers—even policies such as term policies that, by legal definition, lack the policy and cash-value features that are necessary predicates for Plaintiff's theory.

*Second*, the Complaint establishes on its face that owners who selected Option II cannot have suffered any harm under Plaintiff's theory.  Because Option II's death benefit includes a credit for the entire cash value, it necessarily provides class members what Plaintiff demands— and more.

These issues matter.  Standing, including class standing, is the constitutional and jurisdiction minimum for Plaintiff to proceed to litigate a case so expansive that it covers LLANY's entire New York operations.  As a practical matter, enforcing the requirement of class standing now will avoid wasteful discovery and may avoid complex discovery disputes by preventing Plaintiff's meritless claims from supporting a broad, and inevitably futile, fishing expedition.  And that is what the Complaint seeks to accomplish by being utterly silent about the numerous types of policies it seeks to address—until its class allegations expand the scope of the dispute into numerous types of policies that cannot be subject to Plaintiff's theory.

A.     The Complaint does not plead facts to establish class standing for the Premium Refund Class and Universal Life Class.

Class standing exists only where a plaintiff "plausibly alleges (1) that he personally has suffered some actual injury as a result of the putatively illegal conduct of the defendant, and (2) that such conduct implicates the same set of concerns as the conduct alleged to have caused injury

to other members of the putative class by the same defendants." *Ret. Bd. of the Policemen's Annuity & Ben. Fund of the City of Chicago v. Bank of New York Mellon*, 775 F.3d 154, 160 (2d Cir. 2014) (affirming dismissal of class allegations) (internal quotation marks omitted).  In order to implicate "the same set of concerns," a complaint must show (i) the named plaintiff and absent class members ultimately suffered the same type of injuries; that (ii) those injuries flow from the same course of conduct by the defendant; and that (iii) the conduct at issue and the named plaintiff and the absent class members' respective injuries can be established by common proof.  *See id.* Class standing is a jurisdictional issue on which Plaintiff bears the burden.  *Sonterra Capital Master Fund Ltd. v. Credit Suisse Grp. AG*, 277 F. Supp. 3d 521, 544 (S.D.N.Y. 2017) ("As the part[y] invoking federal jurisdiction, [P]laintiff[] bear[s] the burden of establishing standing to bring [his] claims, and thus the Court's jurisdiction to hear those claims.") (granting motion to dismiss on grounds of class standing).

A named plaintiff cannot clear this bar where he seeks to press breach of contract claims on complex financial instruments that he does not hold.  The plaintiffs in *Merryman v. J.P. Morgan Chase Bank, N.A.*, purchased American Depositary Receipts ("ADRs") from defendant J.P. Morgan Chase Bank ("JPM") that required JPM to distribute money from foreign investments in U.S. dollars by applying a certain foreign exchange rate ("FX rate").  2016 WL 5477776, at *1–2 (S.D.N.Y. Sept. 29, 2016).  Alleging that JPM inflated the FX rates of its ADRs by adding a "spread" that amounted to a "fee" prohibited by the ADR contracts, the plaintiffs brought suit on behalf of holders of *all* JPM ADRs, including 107 ADRs in which the plaintiffs did not themselves invest.  *See id.* at *14.  At the motion to dismiss stage, the court held that the plaintiff's lacked class standing to press claims for breach of those ADRs which they did not own:

> "[J]ust as in [*Policemen's Annuity*], in order to prove their case, Plaintiffs will be
> required to prove that JPM added a spread in contravention of the governing

agreements *with respect to each distribution associated with each ADR*. To succeed in proving that there was a breach of contract with respect to each ADR, *inter alia*, Plaintiffs will need to introduce proof regarding the ADR Contract Documents and FX rates used by JPM for each distribution associated with each ADR. . . . Plaintiffs will have to introduce evidence with respect to each distribution associated with each ADR. . . . [T]here may be no uniform pattern because JPM's FX rate practices may have varied depending on the ADR or the currency. The bottom line is that just because JPM added a spread to the FX rate for the distributions of one ADR does not necessarily mean it did so with respect to another ADR.

*Id.*; *see also Sonterra Capital*, 277 F. Supp. 3d at 549 ("It is incumbent on plaintiffs to provide at least some minimal description of these other derivatives and how CHF LIBOR factors into their pricing before the Court can conclude that they implicate the same set of concerns as those derivatives in which plaintiffs transacted.") (granting motion to dismiss).

Similarly, in this case, Plaintiff's claim turns on the Planned Premium feature and requires, at a minimum, a policy with a cash value and that calculates the death benefit similar to Option I. Plaintiff's theory simply does not map onto policies that do not have a "Planned Premium" feature or that have cash-value balances credited toward the death benefit. The differences between Plaintiff's claims and those of the two overbroad classes are far greater than ADR fees or the application of a spread. They implicate fundamentally different instruments with different features and terms, breaking any nexus of injury.

Litigating such disparate classes also violates the rule that the same conduct and facts underlie the claims of both the named and absent parties. The Second Circuit addressed a comparable situation in *Policeman's Annuity*, where the holders of one form of trust certificate sought to expand their case to include trust certificates that they did not own. The panel explained that there was no standing because each instrument had different terms and underlying assets, which would require an asset-by-asset "and trust-by-trust" inquiry. 775 F.3d 154 at 162 (affirming dismissal of class allegations). Likewise, proving that Plaintiff's annual Planned Premium is

refundable under Section 3203(a)(2) does nothing to prove that any amounts paid into other policies are implicated by the statute. *See In re Gen. Motors LLC Ignition Switch Litig.*, 2016 WL 3920353, at *41 (S.D.N.Y. July 15, 2016) ("Plaintiffs alleging other defects—defects that have not been shown to have any connection with each other—would not have claims susceptible to the same kind of common proof." (granting motion to dismiss for lack of class standing)); *cf. Fernandez v. UBS AG*, 222 F. Supp. 3d 358, 373 (S.D.N.Y. 2016) ("[P]laintiffs have alleged that the [f]unds had similar concentrations of similar holdings, which posed similar risks and led to similar conflicts of interest."); *Stanley v. Direct Energy Servs.*, *LLC*, 2020 WL 3127894, at *14–15 (S.D.N.Y. June 12, 2020).

B.    Policyholders who chose Option II have no standing to participate in any class and must therefore be excluded from all class definitions.

Class allegations on behalf of owners of the Policy receiving the Option II death benefit must be excluded from this action because the face of the Complaint (including the Policy, incorporated by reference) makes clear those policyholders have suffered no injury. Plaintiff alleges that owners of the Policy are owed a refund of any Planned Premiums paid for any period beyond the month of death of the insured. But the Policy's Option II death benefit explicitly provides distribution of the Policy account value (*i.e.*, "all net premiums . . . minus the monthly deduction for the current policy month") through the month of death of the insured. Policy at 11; *see also* Bkgd.I.B, above (discussing Option II mechanics). For these policyholders, the account value has been distributed in addition to the Specified Amount and there is nothing left to refund. It is thus apparent from the face of the Complaint that policyholders receiving the Option II death benefit have already received all requested relief, and therefore lack standing to participate in any putative class. *See Denney v. Deutsche Bank AG*, 443 F.3d 253, 264 (2d Cir. 2006) ("[N]o class may be certified that contains members lacking Article III standing."); *see also Tomassini v. FCA*

23

*US LLC*, 326 F.R.D. 375, 385 (N.D.N.Y. 2018) ("Even if one of the named plaintiffs has established standing on behalf of the entire class, the reviewing court must still examine the class definition. 'Ultimately, the Article III standing inquiry must be examined through the prism of the class definition; in this Circuit, a class cannot be certified if any person captured within the class definition lacks Article III standing.'" (quoting *Calvo v. City of New York*, 2018 WL 1633565, at *2 (S.D.N.Y. Apr. 2, 2018))).

Plaintiff cannot avoid this reality and should not be permitted to conduct wasteful discovery where there is no real dispute. *See Sanders v. Apple Inc.*, 672 F. Supp. 2d 978, 990 (N.D. Cal. 2009) ("The Federal Rules provide a mechanism for excising defective class allegations before discovery.") (citing Fed. R. Civ. P. 12(f) and Fed. R. Civ. P. 23(c)(1)(A)).  The court instead strike the class allegations pre-discovery because it is clear "from the face of the complaint that it would be impossible to certify the alleged class regardless of the facts the plaintiffs may be able to obtain during discovery." *Reynolds v. Lifewatch, Inc.*, 136 F. Supp. 3d 503, 511 (S.D.N.Y. 2015) (alterations and quotation marks omitted); *see also Flynn v. DIRECTV, LLC*, 2016 WL 4467885, at *5 (D. Conn. Aug. 23, 2016) (explaining that allegations must "at least plausibly suggest that plaintiffs will produce enough evidence to justify class certification"); *Sanders*, 672 F. Supp. 2d at 990–91.  Accordingly, insofar as Plaintiff's class allegations include policyholders receiving Option II death benefit distributions, those classes are legally defective should be stricken.

## CONCLUSION

For the foregoing reasons, the Court should grant Defendant's Motion and dismiss Plaintiff's Complaint in its entirety.  Alternatively, the Court should dismiss Plaintiff's claims on behalf of the Premium Refund Class and Universal Life Class and strike Plaintiff's class allegations as to policyholders receiving the Option II death benefit.

DATED: November 13, 2020                BOIES SCHILLER FLEXNER LLP

                                         */s/ Sean P. Rodriguez*
                                        Sean Phillips Rodriguez
                                        (admitted *pro hac vice*)
                                        44 Montgomery Street
                                        41st Floor
                                        San Francisco, CA 94104
                                        Telephone: 415.293.6800
                                        Facsimile: 415.293.6899

                                        Alan B. Vickery
                                        avickery@bsfllp.com
                                        333 Main Street
                                        Armonk, New York 10504
                                        Telephone: 914.749.8200
                                        Facsimile: 914.749.8300

                                        John F. LaSalle
                                        jlasalle@bsfllp.com
                                        55 Hudson Yards
                                        New York, New York 10001
                                        Telephone: 212.446.2300
                                        Facsimile: 212.446.2350

                                        *Attorneys for Defendant Lincoln Life & Annuity*
                                        *Company of New York*