```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------X
                                                            :
ANDREW NITKEWICZ, AS TRUSTEE OF THE JOAN                    :
C. LUPE FAMILY TRUST, on behalf of himself and all          :
others similarly situated,                                  :
                                                            :
                                                            :    20 Civ. 6805 (JPC)
                              Plaintiff,                    :
                                                            :    OPINION AND ORDER
            -v-                                             :
                                                            :
                                                            :
                                                            :
LINCOLN LIFE & ANNUITY COMPANY OF NEW                       :
YORK,                                                       :
                                                            :
                              Defendant.                    :
                                                            :
-----------------------------------------------------------------------X
```

JOHN P. CRONAN, United States District Judge:

Plaintiff Andrew Nitkewicz as successor trustee of the Joan C. Lupe Family Trust, on behalf of himself and all others similarly situated, brings this putative class action for breach of contract arising from a universal life insurance policy (the "Policy") issued by Defendant Lincoln Life & Annuity Company of New York ("Lincoln NY"). Plaintiff paid a "Planned Premium" on May 7, 2018, which, pursuant to the Policy, largely went into an interest-bearing account associated with the Policy. Monthly deductions were made from that account to cover the cost of insurance and administrative charges. Plaintiff argues that New York law requires Lincoln NY to refund a portion of that Planned Premium to cover a period that followed the insured's death on October 6, 2018.

Lincoln NY has moved to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure. Because the Court concludes that the Planned Premium was not "actually paid for any period beyond the end of the policy month" of the insured's death, N.Y. Ins. Law § 3203(a)(2), the Court grants Lincoln NY's motion to dismiss.

## I. Background

### A. Facts

The following facts, which are assumed true for purposes of this motion, are taken from the Complaint and from the Policy, which is integral to the Complaint. *See Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002) (noting that at the motion to dismiss stage, a court may consider "any written instrument attached to [the complaint] as an exhibit or any statements or documents incorporated in it by reference" as well as any documents "integral" to the complaint, *i.e.*, "where the complaint 'relies heavily upon [the document's] terms and effect'" (quoting *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.*, 62 F.3d 69, 72 (2d Cir. 1995))); *Pastor v. Woodmere Fire Dist.*, No. 16 Civ. 892 (ADS), 2016 WL 6603189, at *4 (E.D.N.Y. Nov. 7, 2016) ("[C]ourts within this Circuit routinely consider copies of relevant policy documents in connection with insurance disputes."); *see also* Dkt. 26 at 1 (Plaintiffs agreeing that the Court may consider the Policy at this stage).

On April 4, 2011 (the "Policy Date"), Lincoln NY issued a Flexible Premium Adjustable Life Insurance Policy, Dkt. 23, Exh. A ("Policy"), to the Joan C. Lupe Family Trust to insure the life of Joan C. Lupe. Compl. ¶¶ 4, 9.[1] A Flexible Premium Adjustable Life Insurance Policy is Lincoln NY's "generic name for universal life insurance." Policy at 2. There are two main facets of the Policy: insurance coverage and an interest-bearing account with cash value (the "Policy Account" or the "Policy Value"). Policy at 2-5, 7-15; *see* Dkt. 22 ("Motion to Dismiss") at 1.

The Policy allows the Policy owner (the "Owner") to pay flexible premiums. *See* Policy at 2 ("'Flexible premium' means that You may pay premiums by any method agreeable with Us,

---

[1] Plaintiff Andrew Nitkewicz is the current trustee of the Trust. Compl. ¶ 9. Another individual, Robert Wakeman, appears to have been the trustee at the time of Ms. Lupe's death. *See id.*

2

at any time prior to the Insured's Attained Age 121 and in any amount subject to certain limitations. 'Adjustable life insurance' means that You, with Our agreement, can change the death benefit to meet Your changing needs."). This includes a so-called "Planned Premium." "The Planned Premium is the amount of premium [the Owner] intend[s] to pay." *Id.* at 8. The "Premium Frequency," in turn, "is how often [the Owner] intend[s] to pay the Planned Premium." *Id.* "Payment of the Planned Premium is [the Owner's] option," with both the amount and the timing of any Planned Premium largely left to the discretion of the insured. *Id.*; *see also id.* at 5.

When the Owner pays Lincoln NY a premium, including a Planned Premium, Lincoln NY deposits the net premium into the Policy Account. Policy at 2, 4, 11-14. The net premium is based on the "Guaranteed Net Premium Factor" stated in the Policy, which is "assessed against a premium before it is applied" to the Policy Account. *See id.* at 2. The Policy lists net premium factors as part of "Monthly Cost of Insurance and Administrative Charges," which are "applied to cover the company's cost of insurance and other expenses." *Id.* Here, the Guaranteed Net Premium Factor was 85% of the premium paid. *Id.* at 4. Thus, for example, if a policy owner paid a premium of $100, $85 would go to the Policy Account and Lincoln NY would retain $15.

The Policy Account then earns interest, *id.* at 2, 11, and the Owner can also take out a loan against that account, *id.* at 14. The Owner can access the money in the Policy Account by partially or totally surrendering the Policy. *See id.* at 12; *see also id.* at 5, 11.

On the Monthly Anniversary Day, which corresponds to "the same day in each month as the Policy Date," *id.* at 5, Lincoln NY deducts money from the Policy Account to pay for the insurance coverage, *id.* at 9, 11-12. This is referred to as the "monthly deduction." *Id.* at 11. Because here the Policy Date was April 4, 2011, these deductions occurred on the fourth of each month. There are two parts to the monthly deduction: (1) the "cost of insurance" ("COI") charge

3

and (2) "administrative charges." *Id*. at 11. The COI charge is directly proportional to the "net amount at risk" for Lincoln NY, which, in simple terms, is based on the potential payout at the time of the insured's death. *Id.* at 11-12 ("The net amount at risk for the Policy Value calculation is computed as (1) minus (2) where: (1) is the death benefit for the month before reduction for any Debt, discounted to the beginning of the month at the guaranteed interest rate[, and] (2) is the Policy Value at the beginning of the month after subtracting all parts of the monthly deduction other than the cost of insurance.").

If there is insufficient money in the Policy Account on the Monthly Anniversary Day to cover that month's deduction, the Policy enters a grace period. *Id.* at 9 ("If on a Monthly Anniversary Day the Cash Surrender Value is less than the monthly deduction due, Your policy will enter the grace period."); *see also id.* at 5 (defining the Cash Surrender Value as the "Cash Value," *i.e.*, "[t]he Policy Value as of the date of surrender less the charge, if any, for full surrender," minus any "Debt," *i.e.*, "[t]he principal of a policy loan together with interest due"). The Policy may then lapse if the Owner does not pay "the minimum amount needed to continue th[e] policy" within sixty-one days. *Id.* at 9. "If the amount specified is not paid within the grace period, th[e] policy will terminate without value at the end of such period." *Id.* The insured may, within five years of the date of termination, make an application to reinstate the Policy, which includes "pay[ing] an amount that results in a Cash Surrender Value on the date of reinstatement that is sufficient to keep th[e] policy in force for at least two (2) months." *Id.*

The Policy also allows for the Owner to select an optional Coverage Protection Guarantee Rider ("CPGR") add-on.[2] If the Owner opts into the CPGR add-on, the Coverage Protection Guarantee premium is taken from the Policy Account each month as part of the monthly deduction.

---

[2] The CPGR is located at the end of the Policy. Dkt. 23, Exh. A at 29-33 ("CPGR").

*Id.* at 2 ("We deduct the cost of providing the coverage (the cost of insurance) plus the cost of any additional benefits and/or riders and administrative charges from th[e Policy Value] each month as a 'monthly deduction.'"). Lincoln NY applies the Coverage Protection Guarantee Net Premium Factor to any such deductions, and allocates the net premium remaining to specified Coverage Protection Accounts. *Id.* The Coverage Protection Guarantee Net Premium Factor is similar to the 85% guaranteed net premium factor discussed above, except that it varies depending on the Policy Year during which the premium is paid. *Id.* at 4.

The CPGR is designed to "ensure that [the Owner's] coverage will continue even if the Cash Surrender Values are insufficient to cover the monthly deductions." CPGR at 1. The Policy explains how this works:

> The guarantee references an "alternate" value (Coverage Protection Value) calculated by utilizing monthly deduction charges and credited interest rates. All charges and interest rates used in the Coverage Protection Value calculation are fixed and are guaranteed not to increase or decrease for the Initial Specified Amount. You will be notified of any increase in Coverage Protection Guarantee charges due to an increase in Specified Amount. The Coverage Protection Value is not used in determining the actual Policy Value, it is simply a reference value used to determine whether the Coverage Protection Guarantee is in effect.

*Id.* Specifically, the CPGR establishes the Coverage Protection Guarantee Test (the "CPG Test"), which creates a "reference value." *Id.* The CPG Test is satisfied when the reference value is positive; this occurs when the amount in the Coverage Protection Accounts equals or exceeds Debt. *Id.*; Policy at 5 (defining "Debt" as "[t]he principal of a policy loan together with interest due"). When the CPG Test is satisfied, a policy does not enter the grace period, even if the funds in the Policy Account are insufficient to cover the monthly deduction. CPGR at 4. In other words, "[t]he addition of the Coverage Protection Guarantee Rider to the policy provides that the policy and all riders will continue in force as long as either the Cash Surrender Value is sufficient to cover the monthly deduction or the total of the Coverage Protection Accounts equals or exceeds Debt." *Id.*

5

"If neither amount is sufficient and no additional premiums are paid, the policy will terminate according to the Grace Period Provision." *Id.* Here, Plaintiff opted for the CPGR add-on. *See* Policy at 4; Dkt. 25 ("Opposition") at 4.

The Policy provides for two death benefit options. Under Option I, the Policy will pay out, upon the insured's death, either the "Specified Amount" that the Owner has selected or, if higher, the value of the Policy Account multiplied by a factor under an Internal Revenue Code schedule.[3] Policy at 9-10; *see also* Motion to Dismiss at 5. By electing this option, the insured generally pays lower monthly COI deductions because the value of the Policy Account reduces the net amount at risk. *See* Policy at 11 ("The cost of insurance is determined on a monthly basis as the cost of insurance rate for the month multiplied by the net amount at risk for the month."); *id.* (defining the net amount at risk as (1) "the death benefit for the month before reduction for any Debt, discounted to the beginning of the month at the guaranteed interest rate," minus (2) "the Policy Value at the beginning of the month after subtracting all parts of the monthly deduction other than the cost of insurance"); *see also* Opposition at 5. In contrast, under Option II, Lincoln NY pays out both the Policy Account and the Specified Amount upon the insured's death. Policy at 10. Under this option, higher monthly COI charges are therefore deducted from the Policy Account. *See id.* at 11; *see also* Motion to Dismiss at 6. Any death benefit is reduced by any Debt as of the date of death. Policy at 10.

---

[3] This factor, termed the "Corridor Factor," is relevant to ensuring that the Policy meets the Internal Revenue Code's requirements for a "life insurance contract" and that the death benefit qualifies for the Federal Income Tax exclusion. *See* Policy at 10; 26 U.S.C. § 7702; *see also Webber v. Comm'r*, 144 T.C. 324, 371 (2015) ("Under section 7702(a), a policy will be treated as a 'life insurance contract' only if it satisfies either the 'cash value accumulation' test or both the 'guideline premium' test and the 'cash value corridor' test. These tests require complex calculations involving the relationships among premium levels, mortality charges, interest rates, death benefits, and other factors.").

Here, Plaintiff elected the Option I benefit. The Policy had a Specified Amount of $1.5 million. Compl. ¶¶ 4, 9; Policy at 3; *see* Motion to Dismiss at 4-5. The application for the Policy gave Plaintiff the option of various premium frequencies: "Annual," "Semi-Annual," "Quarterly," "Monthly (EFT)," and "Other." Dkt. 23, Exh. A at 42. Plaintiff selected "Annual." *Id.* On May 7, 2018, Plaintiff paid an "Annual Planned Premium" of $53,877.72. Compl. ¶¶ 4, 18.

Ms. Lupe passed away five months later, on October 6, 2018. *Id.* Lincoln NY paid the Specified Amount, *id.* ¶ 4, but declined to refund any portion of the Planned Premium on the basis that "annual planned premiums paid increased the policy value, earned interest, w[ere] accessible for a policy loan, withdrawal or cash surrender, and could have been used to cover future policy expenses," and therefore "there was no 'unearned premium' and no refund of premium was payable," *id.* ¶¶ 4, 5. Plaintiff contends that Lincoln NY's refusal to issue a proportionate refund of the Planned Premium to cover the period from November 2018 (*i.e.*, the month after Ms. Lupe's death) through May 7, 2019 violated New York Insurance Law.

**B. Procedural History**

On August 24, 2020, Plaintiff commenced this action, bringing a single claim of breach of contract. *Id.* ¶¶ 27-31. This case was originally assigned to the Honorable Paul G. Gardephe, but was reassigned to the undersigned on September 29, 2020. *See* Dkt. 11. On November 13, 2020, Lincoln NY moved to dismiss the Complaint. Motion to Dismiss. Lincoln NY also has requested that the Court take judicial notice of publicly available Product Outlines from the New York State Department of Financial Services ("NYDFS"), which Lincoln NY argues support its reading of New York Insurance Law. Dkt. 24.

7

## II. Legal Standard

In considering a motion to dismiss under Rule 12(b)(6), courts assess whether the complaint "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* A complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. In making such determination, the Court must "accept[] as true the factual allegations in the complaint and draw[] all inferences in the plaintiff's favor," *Biro v. Conde Nast*, 807 F.3d 541, 544 (2d Cir. 2015), but need not accept "legal conclusions" as true, *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555).

To state a claim for breach of contract under New York law, a "complaint need only allege (1) the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of contract by the defendant, and (4) damages." *Eternity Glob. Master Fund Ltd. v. Morgan Guar. Tr. Co. of N.Y.*, 375 F.3d 168, 177 (2d Cir. 2004) (quoting *Harsco Corp. v. Segui*, 91 F.3d 337, 348 (2d Cir. 1996)). "The provisions of the parties' agreements establish the rights of the parties and prevail over conclusory allegations in the complaint." *Spinelli v. Nat'l Football League*, 96 F. Supp. 3d 81, 131 (S.D.N.Y. 2015) (citing *805 Third Ave. Co. v. M.W. Realty Assoc.*, 58 N.Y.2d 447, 451 (1983)).

## III. Discussion

The issue before the Court is whether Lincoln NY breached its obligations under the Policy because New York law requires it to refund a portion of the Planned Premium following the insured's death. The Court begins with the text of section 3203(a) of the New York Insurance

Law.  "If the text is unambiguous, [the court's] task is at an end unless the text produces a manifestly absurd result, an exceptionally rare occurrence." *In re Dubroff*, 119 F.3d 75, 76 (2d Cir. 1997).

Under section 3203(a)(2), all insurance policies "delivered or issued for delivery in this state, shall contain in substance" a provision requiring that: (1) "if the death of the insured occurs within the grace period provided in the policy, the insurer may deduct from the policy proceeds the portion of any unpaid premium applicable to the period ending with the last day of the policy month in which such death occurred," and (2) "if the death of the insured occurs during a period for which the premium has been paid, the insurer shall add to the policy proceeds a refund of any premium actually paid for any period beyond the end of the policy month in which such death occurred."  N.Y. Ins. Law § 3203(a).  The latter provision forms the basis of the claims here. "[W]here a policy provision is less favorable to the insured than the provision required by New York Insurance Law, the statutory provision controls." *Terry v. Unum Life Ins. Co. of Am.*, 394 F.3d 108, 110 (2d Cir. 2005).

Both parties seem to agree, at least for the purposes of this motion, that the Planned Premium paid on May 7, 2018 was a "premium" under section 3203(a).  *See* Motion to Dismiss at 2 n.1.  They differ, however, on whether the other requirements of the statute were met.  Plaintiff argues that Lincoln NY must refund a prorated portion of the "annual planned premium" that Plaintiff paid on May 7, 2018, covering the period of time starting in the month after Ms. Lupe's death.  Therefore, it appears that Plaintiff seeks a prorated refund of the $53,877.72 Planned Premium to cover November 2018 through May 2019.  Compl. ¶ 4 ("Plaintiff paid an annual planned policy premium of $53,877.72 on May 7, 2018 . . . .  The insured passed away five months later, on October 6, 2018.  Lincoln NY paid the death benefit but did not include the premium

9

refund for any of the months for which the Plaintiff paid an annual planned premium after the policy month of the insured's death." (emphases omitted)). In moving to dismiss, Lincoln NY argues that this Planned Premium was not, under the terms of the Policy, "actually paid for any period," and thus was not covered by section 3203(a).

## A. "For Any Period"

The Court first looks to the import of section 3203(a)'s language, "for any period." Lincoln NY argues that Plaintiff's Annual Planned Premium was not actually paid for "any period" because the Planned Premium itself did not extend the insured's coverage. Motion to Dismiss at 11-13. Instead, Lincoln NY argues that "only the monthly [COI] deduction pays for insurance coverage 'for any period.'" *Id.* at 9. As explained above, these monthly COI deductions were drawn from the Policy Account.

Plaintiff responds that "premiums" and "deductions" are distinct, and that the law and the Policy, on their plain terms, mandate that insurers refund any overpaid "premiums." *See* Opposition at 6 ("The Statute and Policy use the same word: 'premium.' [Lincoln NY's] lead argument is that 'premium' (as used in Statute) does not mean 'premium' (as used in Policy), but instead means only 'monthly deduction' (as used in the Policy)."). Plaintiff correctly notes that the New York legislature has distinguished elsewhere in the statute between deductions and premiums. *Id.*; *see, e.g.*, N.Y. Ins. Law § 3203(a)(11) (referring to "charges deducted from any premium paid or from the policy value"); *id.* § 3203(a)(16) (referring to "the amount of cost of insurance or other expense charges deducted under the policy"). Plaintiff also points to various other provisions of the Policy that it contends "contradict [Lincoln NY's] claim that 'only the monthly [COI] deduction pays for insurance coverage "for any period."'" Opposition at 11 (second alteration in original) (quoting Motion to Dismiss at 9). For instance, Plaintiff highlights

what it calls the "15% load charge," *i.e.*, the charge that Lincoln NY keeps based on the 85% "guaranteed net premium factor," discussed above. *Id.* at 3, 11-12, 14; Policy at 2, 4. Plaintiff argues that because the Policy states that this "charge" is "applied to cover the company's cost of insurance and other expenses," Policy at 2, it cannot be that only the COI deduction pays for insurance coverage. Opposition at 11. Plaintiff also references the provision requiring the insured to "pay an amount . . . that is sufficient to keep this policy in force for at least two (2) months" to reinstate the Policy following termination. Policy at 9; Opposition at 11. Finally, Plaintiff looks to the Policy's CPGR, arguing that because "[w]hether the CPGR applies depends on the 'frequency, timing, or amount' of premium payments, and a planned premium can be set up to ensure that timely payment thereof keeps the CPGR in effect[,] . . . even under [Lincoln NY's] interpretation, the prorated portion of that annual planned premium must be refunded." Opposition at 11-12; *see* CPGR at 1.

Some of Plaintiff's arguments certainly appear compelling at first blush. But a close reading of the statutory text and the Policy reveal that, for a universal life insurance policy crafted like the one at issue here, a Planned Premium simply is not paid for any specific "period." For instance, a Planned Premium can be less than or greater than the monthly cost of insurance. *See* Policy at 3 ("The Planned Premium may need to be increased to keep this policy and the coverage in force; payment of the Planned Premium may not prevent th[e] Policy from terminating."). A paid Planned Premium may not necessarily "prevent th[e] policy from terminating," and "[f]ailure to pay a Planned Premium will not, in itself, cause th[e] policy to terminate." *Id.* at 8. The Policy will only terminate if it enters the grace period, *i.e.*, if "the Cash Surrender Value is less than the monthly deduction due" —unless, as discussed above, the CPGR applies—and the Owner fails to cure in the manner required by the Policy. *Id.* at 8-9.

11

None of Plaintiff's arguments otherwise are able to overcome this practical reality. First, the so-called load charge is a one-time charge that applies around when the Planned Premium is deposited into the Policy Account. *See id.* at 2 (discussing how the "net premium factor [is] assessed against the premium before it is applied to the Policy Value"). The Policy states that the "Monthly Cost of Insurance and Administrative Charges," of which the net premium factor is a part, are "applied to cover the company's cost of insurance and other expenses." *Id.* A more natural reading of this provision is that the "Monthly Cost of Insurance" covers the "company's cost of insurance," whereas the "Administrative Charges," like the load charge, cover "other expenses." But even assuming the load charge covers the company's cost of insurance in some part, there is nothing to indicate that the load charge covers any specific period of coverage. For example, the Policy does not suggest that this charge could stop the Policy from entering the grace period. *See id.* at 9 ("If on a Monthly Anniversary Day the Cash Surrender Value is less than the monthly deduction due, Your policy will enter the grace period."). Nor does the termination provision help Plaintiff's case; the fact that an amount may be *sufficient* to keep a policy in force does not mean that the amount *necessarily* pays for two months of coverage. Finally, the CPGR is merely used to prevent a policy from entering the grace period by relying on an alternate reference value. CPGR at 1, 4. This alternate reference value "is not used in determining the actual Policy Value." *Id.* at 1. It is still the monthly deductions that actually pay for the insurance.[4]

Moreover, Lincoln NY compellingly demonstrates the myriad issues that would result from interpreting a Planned Premium as being "for" a specific period. For instance, if the Owner makes

---

[4] Plaintiff contends, in a footnote, that "[i]f necessary, Plaintiff can elaborate [on its CPGR argument] in an Amended Complaint." Opposition at 11 n.2. To the extent this can be construed as a request for leave to amend, it is denied, as no elaboration is necessary. The CPGR speaks for itself and is simply not a premium paid "for any period" of coverage.

an unplanned deposit into the Policy Account, it would be exceedingly difficult to identify which payment—the unplanned deposit or the "annual" Planned Premium—was for any specific period of coverage. Plaintiff responds that "[t]he answer . . . is to look at the four corners of the Statute which does not make any reference to, or permit exemptions for, unscheduled payments," and that "[i]n any event, how these hypotheticals might be resolved on the merits has no impact on whether Plaintiff has stated a plausible claim for relief." Opposition at 12. Plaintiff thus seemingly suggests that any unscheduled payments must also be interpreted to cover some period of time. But Plaintiff provides no logical clues as to how that may be done, or why it would be reasonable to interpret the statute to apply to these premiums given the flexible structure of the Policy. And while Plaintiff wants the Court to overlook this issue, this scenario demonstrates exactly why Planned Premiums are not premiums "for any period."

In addition, interpreting a Planned Premium as being "for any period" would create irreconcilable tension with the complementary portion of section 3203(a)(2), which outlines what the insurance company may do if "the death of the insured occurs within the grace period." N.Y. Ins. Law § 3203(a)(2). "It is well settled that 'a statute or legislative act is to be construed as a whole, and all parts of an act are to be read and construed together.'" *MacNeil v. Berryhill*, 869 F.3d 109, 113 (2d Cir. 2017) (quoting *N.Y. State Psychiatric Ass'n, Inc. v. N.Y. State Dep't of Health*, 19 N.Y.3d 17, 23-24 (2012)). Under that provision of section 3203(a)(2), if the insured's death occurs within the grace period, "the insurer may deduct from the policy proceeds the portion of any unpaid premium applicable to the period ending with the last day of the policy month in which such death occurred," so long as that was not otherwise waived. N.Y. Ins. Law § 3203(a)(2).

If the Court were to interpret this provision consistent with Plaintiff's proposed meaning of "premium actually paid for any period," an insurance company would seemingly be permitted

13

to deduct from the Policy Account an unpaid Planned Premium, even if a prorated portion of that unpaid Planned Premium was substantially greater than the relative cost of insurance for that month. But Planned Premiums are, by definition, optional statements of intent. *See* Policy at 8 ("Payment of the Planned Premium is [the Owner's] option."). Plaintiff's reading of the statute would thus transform a statement of intent into a binding promise upon the death of the insured. Plaintiff has no real response to this, stating solely, "that provision only applies when the death occurs 'within the grace period provided in the policy,' which is not at issue here." Opposition at 13. Although that may be true, the Court must still interpret the statute, and "[i]nterpretation of one provision of a statute . . . 'cannot be divorced from its statutory context.'" *MacNeil*, 869 F.3d at 113 (quoting *In re Avella v. City of New York*, 29 N.Y.3d 425, 436 (2017)). The Court cannot ignore the implications of Plaintiff's proposed reading on other parts of the statute—particularly those within the same subsection.

Plaintiff makes an additional argument separate and apart from the statutory text: The Policy referred to this as an "ANNUAL" Planned Premium, Policy at 4, and, Plaintiff contends, a reasonable person would interpret this to mean that the Planned Premium was for an "annual" period, *see* Opposition at 10; *see Dean v. Tower Ins. Co.*, 19 N.Y.3d 704, 708 (2012) ("Insurance contracts must be interpreted according to common speech and consistent with the reasonable expectation of the average insured." (quoting *Cragg v. Allstate Indem. Corp.*, 17 N.Y.3d 118, 122 (2011)). In support, Plaintiff draws upon New York's *contra proferentem* doctrine, which requires courts, as a last resort, to resolve ambiguities in an insurance contract in favor of the insured. Dkt. 19 at 3 ("At best, [Lincoln NY's] argument is that the meaning of 'premium' under the Policy is ambiguous, but 'New York law recognizes a well-established *contra proferentem* rule, under which any ambiguity in an insurance policy must be construed against the insurer.'" (quoting *U.S.*

14

*Bank Nat'l Ass'n v. PHL Variable Ins. Co.*, No. 12 Civ. 6811 (CM), 2014 WL 2199428, at *7 (S.D.N.Y. May 23, 2014))); Opposition at 10 ("Plaintiff does not invoke *contra preferentem* [sic] to construe the meaning of the Statute but rather to resolve any ambiguity relating to what the Policy meant by 'annual' 'planned premium.'"); *see Schering Corp. v. Home Ins. Co.*, 712 F.2d 4, 10 n.2 (2d Cir. 1983) ("[*C*]*ontra preferentem* [sic] is used only as a matter of last resort, after all aids to construction have been employed but have failed to resolve the ambiguities in the written instrument.").

But the Court need not go so far, because the plain language of the Policy does not support Plaintiff's reading. *See Olin Corp. v. Am. Home Assurance Co.*, 704 F.3d 89, 103 n.19 (2d Cir. 2012) ("Because [the provision] is unambiguous, we do not consider extrinsic evidence in interpreting the provision, nor do we apply the rule of *contra proferentem*." (citation omitted)). "It is an elementary rule of contract construction that clauses of a contract should be read together contextually in order to give them meaning." *HSBC Bank USA v. Nat'l Equity Corp.*, 719 N.Y.S.2d 20, 22 (App. Div. 2001). The Policy explicitly defines the Premium Frequency as "*how often* [the Owner] intend[s] to pay the Planned Premium." Policy at 8 (emphasis added). The Policy also makes clear that the "Planned Premium and Premium Frequency, as shown on the policy specifications page, are selected by [the Owner]." *Id.* Thus, the Premium Frequency—which in this case was annual—defines the anticipated recurrence of payment of the Planned Premium; it does not state the Planned Premium is *for* a specific period of coverage. Plaintiff cannot interpret the word "annual" in isolation to create ambiguity where there is none.

Finally, Plaintiff argues that Lincoln NY's reading of the statute would effectively remove all universal life insurance policies from its coverage. Section 3203(a)(2) applies to "all life insurance policies," save two types not relevant here. *See* N.Y. Ins. Law § 3203(a)(1)-(2). For

instance, a term life insurance policy would more clearly fall under the statute. With a term life insurance policy, the insured pays for life insurance for a specified term and does not pay any funds into a cash-value account. *See* 31 N.Y. Prac., New York Insurance Law § 24:4 ("'Term life' insurance is defined as life insurance for a specified term only, the premium being calculated on a basis which provides coverage only for a death which occurs during the term"); 11 N.Y.C.C.R. § 53-2.7; *see also* Motion to Dismiss at 6-7. As Plaintiff explains, the legislature was surely aware of how to distinguish between universal life insurance policies from term life insurance policies. Opposition at 8, 15; *see, e.g.*, N.Y. Ins. Law § 3203(a)(1) (imposing a longer grace period for "policies in which the amount and frequency of premiums may vary").

But *all* universal life insurance policies are not before this Court, and the Court has no occasion to pass on all forms of universal life insurance policies available in New York state. *See* Dkt. 28 at 4 (Lincoln NY arguing, "Plaintiff assumes that all universal life contracts are structured like the Policy . . . . This case presents the provisions of a specific Policy, as well as Plaintiff's choices and voluntary payment under that Policy."). The Court looks only to this Policy, and concludes that Lincoln NY was not statutorily required to refund some portion of the Planned Premium.

While Plaintiff here could have elected the Option II death benefit, pursuant to which Lincoln NY would have paid out both the Policy Account and the Specified Amount upon Ms. Lupe's death, Policy at 10, Plaintiff chose not to do so. Instead, Plaintiff elected the Option I benefit, pursuant to which the Policy Account—and any Planned Premiums deposited into that account—would not be refunded if that Policy Account (times the applicable tax multiplier) were lower than the Specified Amount. The Court will not now invalidate Plaintiff's election. New

York law does not prohibit this type of plan, and the law does not mandate that Lincoln NY refund any portion of the Planned Premiums.

## B. "Actually Paid"

The Court next turns to the meaning of the phrase "actually paid." *See* N.Y. Ins. Law § 3203(a)(2) ("[I]f the death of the insured occurs during a period for which the premium has been paid, the insurer shall add to the policy proceeds a refund of any premium *actually paid* for any period beyond the end of the policy month in which such death occurred." (emphasis added)). Whereas Lincoln NY contends that the "statute's emphatic use of 'actually' . . . distinguishes statements of intent and funds to which the Owner retains some rights from premium payments that become revenue to the insurer," Motion to Dismiss at 13, Plaintiff argues that "[t]he use of the word 'actually' presumably distinguishes a premium that was due but not paid," Opposition at 15.

Admittedly, the phrase "actually paid," in the abstract, might not be enough to make clear that Planned Premiums are not covered by this provision. However, the Court must read the phrase "actually paid" in context. *See United States v. Kozeny*, 541 F.3d 166, 171 (2d Cir. 2008) ("Statutory enactments should, moreover, be read so as 'to give effect, if possible, to every clause and word of a statute.'" (quoting *Duncan v. Walker*, 533 U.S. 167, 174 (2001)). When read in conjunction with the term "for any period," the phrase "actually paid" serves to further distinguish between payments promised and payments that have actually paid for a period of coverage. As Lincoln NY points out, Planned Premiums are simply "a statement of intent and increase the account value," and in doing so "earn[] interest, and . . . are accessible to the owner." Motion to Dismiss at 13. In other words, although these funds are largely transferred to the Policy Account, the funds do not actually pay for any insurance until they are taken from the Policy Account via

the monthly deduction. *See Banker's Tr. Co. v. Equitable Life Assurance Soc'y*, 257 N.Y.S.2d 502, 506 (App. Div. 1965) ("[T]he cash surrender value of a policy is a 'fund' held by the insurer for the benefit of the insured."), *rev'd on other grounds sub nom. Bankers Tr. Co. v. Equitable Life Assurance Soc'y*, 19 N.Y.2d 552 (1967). Although Plaintiff contends that the Planned Premiums are revenue to Lincoln NY "insofar as [Lincoln NY] claims to use these premium payments to offset the death benefits paid to policyholders" and because Lincoln NY deducts the so-called load charge, Opposition at 15, the fact that Lincoln NY may be able to benefit from the Planned Premium does not mean these funds "actually pay" for any period of insurance.

\* \* \*

In light of the above, the Court need not consider Lincoln NY's policy arguments—or, for that matter, Plaintiff's policy arguments. For instance, Lincoln NY argues that section 3203(a)(2) has the "straightforward purpose" of "prevent[ing] insurers from taking and keeping money for which the insured gets no benefit." Motion to Dismiss at 10. According to Lincoln NY, "the customer immediately benefits from a Planned Premium deposit and the insurer upholds its end of the bargain by paying interest, adjusting the COI charge, providing the opportunity for a loan or (partial) surrender, and so forth." *Id.* But when engaging in statutory interpretation, "[t]he relevant question is not whether, as an abstract matter, the rule advocated by [a party] accords with good policy." *Badaracco v. Comm'r*, 464 U.S. 386, 398 (1984). It is not a court's job to "rewrite a statute because [it] might deem its effects susceptible of improvement." *Id.* Instead, the Court's job is to interpret the statutory language. Having reviewed the plain text and the surrounding statutory provisions, the Court determines that the Planned Premium here was not a "premium actually paid for any period beyond the end of the policy month" in which the insured died, such that it would be covered under the statute.

18

The Court therefore also does not address (1) Lincoln NY's alternative argument that Plaintiff has "already received the Policy Account value, including any value attributable to [Plaintiff's] last Planned Premium deposit," meaning there is "no premium to be refunded," Motion to Dismiss at 17-19, or (2) Lincoln NY's argument that Plaintiff's class allegations suffer fundamental standing defects, *id.* at 19-24. In addition, because the Court finds that the statute does not require Lincoln NY to refund the Planned Premiums, the Court denies Lincoln NY's request for judicial notice of the NYDFS Product Outlines as moot. *See United States v. Bleznak*, 153 F.3d 16, 21 n.2 (2d Cir. 1998) ("In connection with this issue, appellants have filed a motion asking us to take judicial notice of several court filings cited in their brief. Because these filings are not relevant to our disposition of this appeal, we deny the motion as moot."); *Grievance Comm. of S. Dist. of N.Y. v. Grimm*, 691 F. App'x 668, 671 (2d Cir. 2017) ("Because we reach these conclusions without consulting the documents that are the subject of the Committee's motion for judicial notice, that motion is denied as moot.").

### IV. Conclusion

For the aforementioned reasons, the Court grants Lincoln NY's motion to dismiss with prejudice and denies as moot its request for judicial notice of the NYDFS Product Outlines. The Clerk of the Court is respectfully directed to terminate all motions and close this case.

SO ORDERED.

Dated: July 2, 2021
New York, New York

                                             JOHN P. CRONAN
                                        United States District Judge